IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF CONNECTICUT,<br>by Attorney General Richard Blumenthal<br>Antitrust Department<br>110 Sherman Street<br>Hartford, CT 06105; | ) ) ) ) ) ) |
| | ) |
| STATE OF FLORIDA,<br>by Attorney General Robert A. Butterworth<br>Antitrust Section<br>PL-01, The Capitol<br>Tallahassee, FL 32399-1050; | ) ) ) ) ) ) |
| | ) |
| STATE OF ILLINOIS,<br>by Attorney General James E. Ryan<br>Antitrust Bureau<br>100 West Randolph Street<br>Chicago, IL 60601; | ) ) ) ) ) ) |
| | ) |
| STATE OF MINNESOTA,<br>by Attorney General Hubert H. Humphrey III<br>Antitrust Division<br>N.C.L. Tower, Suite 1400<br>445 Minnesota Street<br>St. Paul, MN 55101; | ) ) ) ) ) ) ) |
| | ) |
| STATE OF NEW YORK,<br>by Attorney General Dennis C. Vacco<br>Antitrust Bureau<br>120 Broadway, Suite 26-01<br>New York, NY 10271; | ) ) ) ) ) ) |
| | ) |
| STATE OF NORTH CAROLINA,<br>by Attorney General Michael F. Easley<br>Consumer Protection/Antitrust Section<br>114 W. Edenton Street<br>P.O. Box 629<br>Raleigh, North Carolina 27602; | ) ) ) ) ) ) |

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

FILED   CIVIL NUMBER:_____

DEC 22, 1998

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CASE NUMBER   1:98CV03115

JUDGE: Thomas F. Hogan

DECK TYPE: Antitrust

DATE STAMP: 12/22/98

**STATES' COMPLAINT, Dec. 22, 1998**



STATE OF OHIO,                                              )
by Attorney General Betty D. Montgomery                     )
Antitrust Section                                           )
140 East Town Street, 1st Floor                             )
Columbus, Ohio 43215;                                       )
                                                            )
COMMONWEALTH OF PENNSYLVANIA,                               )
by Attorney General D. Michael Fisher                       )
Antitrust Section                                           )
14th Floor, Strawberry Square                               )
Harrisburg, PA 17120;                                       )
                                                            )
STATE OF WEST VIRGINIA,                                     )
by Attorney General Darrel V. McGraw, Jr.                   )
Consumer Protection and Antitrust Division                  )
P.O. Box 1789                                               )
Charleston, WV 25326-1789;                                  )
                                                            )
STATE OF WISCONSIN,                                         )
by Attorney General James E. Doyle                          )
Antitrust Unit                                              )
123 West Washington Avenue                                  )
Madison, WI 53703-7857;                                     )
                                                            )
                          Plaintiffs,                       )
                                                            )
                          v.                                )
                                                            )
MYLAN LABORATORIES, INC.,                                   )
130 Seventh Street,                                         )
1030 Century Building,                                      )
Pittsburgh, Pennsylvania 15222                              )
                                                            )
CAMBREX CORPORATION,                                        )
One Meadowlands Plaza                                       )
East Rutherford, New Jersey 07073                           )
                                                            )
PROFARMACO S.R.L.                                           )
Via Cucchiari, 17                                           )
1-20155 Milano, Italy                                       )

**STATES' COMPLAINT, Dec. 22, 1998**

GYMA LABORATORIES OF AMERICA, INC.,    )
135 Cantiague Rock Road,                )
Westbury, New York 11590                )
                                        )
SST CORPORATION,                        )
635 Brighton Road,                      )
Clifton, New Jersey 07015,              )
                                        )
                      Defendants.       )
_____)

I.

SUMMARY OF COMPLAINT

1.      The States of Connecticut, Florida, Illinois, Minnesota, New York, North Carolina,

Ohio, West Virginia, Wisconsin and the Commonwealth of Pennsylvania (collectively, Plaintiff States

or States), by and through their Attorneys General, bring this action as *parens patriae* on behalf of

natural persons in their respective States, and on behalf of their respective States' general economies,

in their sovereign capacities, and in their proprietary capacities as injured purchasers on behalf of

departments, bureaus and agencies of State government, against Defendants Mylan Laboratories, Inc.

(Mylan), Cambrex Corporation (Cambrex), Profarmaco S.r.l. (Profarmaco), Gyma Laboratories of

America, Inc. (Gyma), and SST Corporation (SST) (collectively, Defendants).

2.      The States seek relief to remedy and compensate for injuries sustained as a result of

the Defendants' violations of the antitrust laws of the United States and related laws of the States.

The States allege Defendants Mylan, Cambrex, Profarmaco and Gyma:  1) conspired to monopolize

the markets for generic lorazepam tablets and generic clorazepate tablets; and 2) entered into

unlawful contracts, combinations and conspiracies relating to the supply of the active pharmaceutical

**STATES' COMPLAINT, Dec. 22, 1998**

ingredient (API) for clorazepate and lorazepam in unreasonable restraint of trade. The States further allege Defendant Mylan attempted to monopolize and did in fact unlawfully monopolize the markets for generic lorazepam and generic clorazepate tablets. The States also allege Defendants Mylan, Cambrex, Profarmaco, Gyma and SST conspired and agreed to fix, raise, or stabilize the prices of lorazepam API. Finally, the States allege supplemental state law claims.

## II.

## JURISDICTION AND VENUE

3.     This Complaint, which alleges violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, is filed under and jurisdiction is conferred upon this Court by Sections 4, 4c and 16 of the Clayton Act, 15 U.S.C. §§ 15, 15c, and 26. The States seek to recover treble damages and the costs of suit, including reasonable attorneys' fees, together with injunctive relief, for injuries sustained as a result of the violations alleged herein by the States in their proprietary capacities, and as *parens patriae* on behalf of all natural persons residing in their States who purchased lorazepam and clorazepate.

4.     This Complaint also alleges violations of state antitrust and/or unfair competition statutes and related state laws as set forth in Paragraphs 77 through 97 below, and seeks relief under those state laws for claims brought by the following States: Connecticut, Florida, Illinois, Minnesota, New York, North Carolina, Ohio, West Virginia, and Wisconsin. All claims under federal and state law are based upon a common nucleus of operative facts and the entire action commenced by this Complaint constitutes a single case which would ordinarily be tried in one judicial proceeding.

**STATES' COMPLAINT, Dec. 22, 1998**

5.     This Court has jurisdiction of the action under the provisions of 28 U.S.C. §§ 1331, 1337 and 1367(a), as well as under the principles of supplemental jurisdiction.  Supplemental jurisdiction would avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience and fairness.

6.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c), because at all times relevant to the bringing of this action, Defendants transacted business, did business, were found or resided in the District of Columbia or because the claims alleged arose, in part, in this judicial district.

III.

THE PARTIES

7.     The States bring this action by and through their Attorneys General, as *parens patriae* on behalf of natural persons, and on behalf of their respective States' general economies, in their sovereign capacities, and in their proprietary capacities, as injured purchasers on behalf of departments, bureaus and agencies of State government.

8.     Defendant Mylan is a corporation organized, existing, and doing business under and by virtue of the laws of Pennsylvania.  Mylan's office and principal place of business is located at 130 Seventh Street, 1030 Century Building, Pittsburgh, Pennsylvania 15222.  Mylan is engaged in the business of developing, licensing, manufacturing, marketing, and distributing generic and proprietary pharmaceutical and wound care products, including at least 91 generic drugs.  In the twelve months ending March 31, 1998, Mylan had revenues of $555.4 million and net income of $100.7 million. Mylan Pharmaceuticals, Inc., a wholly owned subsidiary of Mylan Laboratories, is one of the world's

**STATES' COMPLAINT, Dec. 22, 1998**

largest generic drug companies. Mylan Pharmaceuticals is located at 781 Chestnut Ridge Road, P.O. Box 4310, Morgantown, West Virginia 26504-4310. Mylan Laboratories has ultimate control over the activities of Mylan Pharmaceuticals. Upon information and belief, UDL Laboratories, Inc., a wholly owned subsidiary of Mylan Laboratories, specializes in packaging technology and produces unit dose multi-source pharmaceuticals. UDL Laboratories is located in Loves Park, Illinois, and its mailing address is P.O. Box 2629, Loves Park, Illinois 61132-2629. Upon information and belief, at all relevant times, Mylan Laboratories has had ultimate control over the activities of UDL Laboratories.

9.     Defendant Cambrex is a corporation organized, existing, and doing business under and by virtue of the laws of Delaware. Cambrex's office and principal place of business is located at One Meadowlands Plaza, East Rutherford, New Jersey 07073. Cambrex is engaged in the business of manufacturing and selling chemicals for pharmaceuticals, cosmetics, agriculture, and other industrial uses. In 1997, Cambrex had revenues of $380 million and net income of $17.8 million. Cbm Technologies, Inc. (Cbm) is a subsidiary of Cambrex located at 1 East First Street, Reno, Nevada 89501. Upon information and belief, Cbm was the primary contracting party, on behalf of Cambrex, in the exclusive licensing arrangements with Mylan described below. Upon information and belief, at all relevant times, Cambrex has had ultimate control over the activities of Cbm.

10.     Defendant Profarmaco S.r.l., a wholly owned subsidiary of Cambrex, is based in Milan, Italy and is located at Via Cucchiari, 7, 1-20155, Milano, Italy. Profarmaco is engaged in the business of manufacturing chemicals, including APIs, and selling them to drug manufacturers in the United States and elsewhere. The API, which is the chemical that allows the drug to affect the body,

**STATES' COMPLAINT, Dec. 22, 1998**

is the most essential raw material for a pharmaceutical product. Upon information and belief, at all relevant times, Cambrex has had ultimate control over the activities of Profarmaco.

11.     Defendant Gyma is a corporation organized, existing, and doing business under and by virtue of the laws of New York. Gyma's office and principal place of business is located at 135 Cantiague Rock Road, Westbury, New York 11590. Gyma is engaged in the business of selling APIs and other chemicals to the pharmaceutical industry. In 1997, Gyma had sales of approximately $91 million. Gyma buys APIs from Profarmaco and other firms and resells them to generic drug manufacturers in the United States.

12.     Defendant SST is a corporation organized, existing, and doing business under and by virtue of the laws of New Jersey. SST's office and principal place of business is located at 635 Brighton Road, Clifton, New Jersey 07015. SST is engaged in the business of selling APIs and other chemicals to the pharmaceutical industry. SST buys APIs from Fabricca Italiana Sintetici SpA (FIS) and other firms and resells them to generic drug manufacturers in the United States.

IV.

CO-CONSPIRATORS

13.     Upon information and belief, other persons, firms, corporations and entities not named as Defendants herein have participated as co-conspirators with the Defendants in the violations alleged in this Complaint, and have performed acts and made statements in furtherance thereof.

**STATES' COMPLAINT, Dec. 22, 1998**

V.

THE GENERIC DRUG INDUSTRY

14.     Generic drugs, which are chemically identical versions of branded drugs, cannot be marketed until after the patent on the branded drug has expired.  Firms that manufacture and market generic drugs often specialize in such drugs, although Mylan manufactures both generic and branded drugs.  Generic drugs typically are sold at substantial discounts from the price of branded drugs.

15.     Mylan and other generic drug manufacturers require the approval of the United States Food and Drug Administration (FDA) to market a generic product in the United States.  For each generic drug, the manufacturer must file an Abbreviated New Drug Application (ANDA) with the FDA to establish that its version of the drug is therapeutically equivalent to the branded drug.  FDA approval of an ANDA takes an average of about 18 months, although the approval process can take two years or more.

16.     Typically, the generic manufacturer purchases the API from a specialty chemical manufacturer (API supplier).  The generic manufacturer combines the API with inactive fillers, binders, colorings, and other chemicals to produce a finished product.

17.     To sell an API in the United States, the API supplier must file a Drug Master File (DMF) with the FDA.  The DMF explains the processes that the API supplier uses to make the API and to test chemical equivalence and bioequivalence to the brand product.  To use an API, the generic manufacturer's ANDA must refer to the API supplier's DMF filed with the FDA.  More than one drug manufacturer can reference the DMF of the same API supplier.  A generic manufacturer that wants or needs to change its API supplier must obtain FDA approval of an ANDA supplement, which

**STATES' COMPLAINT, Dec. 22, 1998**

includes a reference to the new supplier's DMF and test results regarding the generic manufacturer's product using the new API. This process can take as long as three years, with an average of about eighteen months.

18.     Lorazepam and clorazepate are two of the approximately 91 generic drugs that Mylan currently manufactures and sells in tablet form. Lorazepam is used to treat anxiety, tension, agitation, and insomnia, and as a preoperative sedative. Doctors issue over 18 million prescriptions a year for lorazepam tablets. Because lorazepam is used to treat chronic conditions and is heavily prescribed for nursing home and hospice patients, lorazepam users tend to stay on the drug for long periods of time. Clorazepate is used to treat anxiety, as well as hypertension, and in adjunct therapy for nicotine and opiate withdrawal. Doctors issue over three million prescriptions a year for clorazepate tablets.

19.     Profarmaco and FIS both manufacture APIs in Italy. Both companies hold DMFs for lorazepam API and clorazepate API, and have supplied such APIs to drug manufacturers in the United States. Foreign firms, like Profarmaco and FIS, that supply APIs to the United States typically have distributors in the United States who purchase APIs and resell them to generic drug manufacturers in the United States. Mylan purchases its lorazepam and clorazepate API from Gyma, Profarmaco's United States distributor of these products. Several other generic drug manufacturers have purchased lorazepam API from SST, FIS's United States distributor of this product. Mylan has never purchased FIS's lorazepam API from SST because FIS is not an approved lorazepam supplier for Mylan -- *i.e.*, Mylan's ANDA does not reference FIS's DMF.

**STATES' COMPLAINT, Dec. 22, 1998**

VI.

TRADE AND COMMERCE

20.     At all times relevant to this Complaint, Defendants Mylan, Cambrex, Profarmaco, Gyma and SST participated in the market for generic pharmaceuticals throughout the United States.

21.     Defendant Mylan manufactured, marketed, sold and distributed generic pharmaceutical products throughout the United States.  Mylan's products were transported across state lines and were sold in the various States.  The products sold and distributed by Defendant Mylan were shipped in interstate commerce.

22.     Defendant Gyma is engaged in the business of selling APIs and other chemicals to the pharmaceutical industry.  Gyma buys APIs from Profarmaco and other firms and resells them to generic drug manufacturers in the United States.

23.     Defendant SST is engaged in the business of selling APIs and other chemicals to the pharmaceutical industry.  SST buys APIs from FIS and other firms and resells them to generic drug manufacturers in the United States.

24.     Defendant Profarmaco is engaged in the business of manufacturing chemicals, including APIs, and selling them to drug manufacturers in the United States and elsewhere.

25.     Defendant Cambrex is engaged in the business of manufacturing and selling chemicals for pharmaceuticals, cosmetics, agriculture, and other industrial uses.

26.     The activities of the Defendants, including manufacturing, marketing, distributing and selling pharmaceutical products, were in the regular, continuous and substantial flow of interstate commerce and have had and continue to have a substantial effect upon interstate commerce.

**STATES' COMPLAINT, Dec. 22, 1998**

## VII.

## RELEVANT MARKETS

27.     There are four relevant markets:  (1) the market for generic lorazepam tablets approved for sale in the United States; (2) the market for generic clorazepate tablets approved for sale in the United States; (3) the market for lorazepam API approved for sale in the United States; and (4) the market for clorazepate API approved for sale in the United States.

## VIII.

## ANTICOMPETITIVE CONDUCT

28.     In 1997, Mylan embarked on a strategy to raise the price, and thereby increase the profitability of some of its generic drugs.  One part of this strategy was to seek from its API suppliers, long-term exclusive licenses for the DMFs of certain APIs selected by Mylan because of limited competition.  If Mylan obtained such an exclusive license, no other generic drug manufacturer could use that supplier's API to make the drug in the United States.

29.     Ultimately, Mylan sought exclusive licenses for the DMFs for lorazepam API and clorazepate API.

30.     Mylan began negotiating for exclusive licenses with Profarmaco and its distributor Gyma, which sold lorazepam and clorazepate APIs to Mylan.  The parties negotiated at meetings in Bologna, Italy; in London; and in New York.  These negotiations concerned Mylan's proposal to Profarmaco that Profarmaco license exclusively to Mylan, for ten years, Profarmaco's DMFs for lorazepam and clorazepate API.  The exclusive licenses would provide Mylan complete control over Profarmaco's entire supply of lorazepam and clorazepate API entering the United States market.

**STATES' COMPLAINT, Dec. 22, 1998**

31.     Prior to these negotiations, Gyma sold Profarmaco's lorazepam API to Mylan, Watson Pharmaceuticals, Inc. (Watson), and Purepac, a subsidiary of Faulding, Inc. (Purepac), and its clorazepate API to Mylan and Watson.   Purepac and Watson are generic drug producers that compete with Mylan.   At this time, Profarmaco (through Gyma) was the only source selling lorazepam and clorazepate API to generic manufacturers in the United States.   FIS, which previously had supplied the U.S. market with lorazepam API, recently had exited the market because it no longer had any customers.   With complete control of Profarmaco's supply of these products, and by refusing to sell any to its competitors, Mylan could deny its competitors access to the most important ingredient for producing lorazepam and clorazepate tablets.

32.     In return for the ten year exclusive licenses, Mylan offered to pay Cambrex, Profarmaco, and Gyma a percent of its gross profits on its sales of lorazepam and clorazepate tablets, regardless of whether Mylan purchased the API from Profarmaco through Gyma.   The profit sharing percentage offered by Mylan was smaller for lorazepam than clorazepate.   As Mylan explained to Cambrex, Profarmaco, and Gyma, the reason for this difference was that Mylan intended to seek a similar exclusive agreement on lorazepam API with FIS, a competitor of Profarmaco, and with FIS's distributor, SST.   Under this proposed agreement, Mylan would also pay FIS and SST a certain percent of Mylan's gross profits on lorazepam tablets, even though Mylan could not purchase FIS lorazepam API due to FDA regulations.

33.     In October 1997, Mylan approached SST, FIS's distributor of lorazepam API in the United States, regarding a possible second exclusive licensing agreement for lorazepam API.   The intent of this approach was to deny Mylan's competitors an alternate source of lorazepam API.

**STATES' COMPLAINT, Dec. 22, 1998**

Because of FDA regulations which require a manufacturer's ANDA to reference the DMF of its supplier, Mylan could not even use FIS's lorazepam API. Before Mylan could use FIS's product, it was required to supplement its ANDA, which could take an average of 18 months. Mylan explained to SST that it intended to raise the price of lorazepam tablets by controlling the supply of lorazepam API. In exchange for this exclusive license which would prevent any Mylan competitor from using FIS's lorazepam API, Mylan offered SST a percent of Mylan's gross profits on lorazepam tablets. Under this proposal, SST would receive these profits even though Mylan would not purchase from SST any lorazepam API. SST turned down Mylan's proposed licensing arrangement. Had SST accepted, none of Mylan's competitors would have been able to use FIS lorazepam API to make or sell lorazepam tablets in the United States.

34.    Profarmaco and Gyma signed the ten year exclusive agreements licensing the two DMFs to Mylan on November 14, 1997. Through these agreements, Mylan obtained control over the supply of Profarmaco's APIs for lorazepam and clorazepate in the United States, denying Mylan's competitors (particularly Gyma's customers Watson and Purepac) access to these essential raw materials. In 1997, Profarmaco, through Gyma, supplied over 90% of the lorazepam API and 100% of the clorazepate API to generic manufacturers in the United States market.

35.    Without a source of supply, Watson and Purepac attempted to secure alternate API suppliers. Recognizing that Mylan now had control over lorazepam API from Profarmaco, Purepac even approached Mylan to obtain some lorazepam API on an emergency basis. Mylan refused to sell this product to Purepac.

**STATES' COMPLAINT, Dec. 22, 1998**

36.     Shortly after Mylan signed the ten year exclusive licensing agreements with Profarmaco, SST's president met in Pittsburgh, Pennsylvania, with the Mylan vice president who has responsibility for purchasing APIs.  At this meeting, which occurred on or around November 20, 1997, SST explained to Mylan that it would not license FIS's DMF for lorazepam API to Mylan, at least in part out of concern that such an agreement could violate the antitrust laws.  Nevertheless, through the Pittsburgh meeting, or otherwise in the course of their exchanges of information before and after it, Mylan and SST conspired and reached an agreement to fix, raise or stabilize the prices of lorazepam API.

37.     On January 12, 1998, despite no significant increase in its costs, Mylan raised its price of clorazepate tablets to State Medicaid programs, wholesalers, retail pharmacy chains, and other customers by amounts ranging from 1,900 percent to over 3,200 percent, depending on the bottle size and strength.  For example, a 500 count bottle of 7.5 mg clorazepate tablets increased in price from $11.36 to $377.00.  On March 3, 1998, despite no significant increase in its costs, Mylan raised its price of lorazepam tablets by amounts ranging from 1,900 percent to over 2,600 percent, depending on the bottle size and strength.  For example, a 500-count bottle of 1 mg lorazepam tablets increased in price from $7.30 to $191.50.  The ultimate retail price to consumers was even higher.  Mylan's competitors matched these price increases for lorazepam and clorazepate tablets.

38.     Shortly after Mylan raised its price of lorazepam tablets, and despite no significant increase in its costs, SST carried out its part of the agreement by raising the price of FIS lorazepam API by approximately 19,000 percent.  SST sold FIS's lorazepam API to Geneva -- one of Mylan's competitors.  Geneva has set its price for lorazepam tablets at approximately Mylan's level.

**STATES' COMPLAINT, Dec. 22, 1998**

39.     As a result of these substantial and unprecedented agreements and price increases for lorazepam and clorazepate tablets, many purchasers, including pharmacies, hospitals, insurers, managed care organizations, wholesalers, government agencies, patients, consumers and others, have paid substantially higher prices. Moreover, some patients may have stopped taking lorazepam and clorazepate tablets altogether, or been forced to reduce the quantity they take, because they cannot afford them.

40.     As a result of these substantial and unprecedented price increases on lorazepam and clorazepate tablets, Mylan, Cambrex, Profarmaco, Gyma and SST have profited, and continue to profit, from their unlawful conduct, to the detriment of consumers.

IX.

LACK OF PROCOMPETITIVE JUSTIFICATION

41.     The exclusive licensing agreements, and Defendants' other conduct intended to lock-up the supply of lorazepam and clorazepate API, lack any legitimate business or procompetitive justification. Moreover, any justification that may exist does not outweigh the substantial anticompetitive effects of Defendants' conduct.

42.     The exclusive licensing agreements were not reasonably necessary to protect Mylan's supply of lorazepam and clorazepate API. Profarmaco never indicated that it was considering no longer making either of these products. Even if Mylan had legitimate concerns about the supply of lorazepam API, like other generic pharmaceutical manufacturers, Mylan could have entered into a less restrictive requirements contract which would have assured Mylan a source of supply, but not denied Mylan's competitors access to the same source. Moreover, its attempt to obtain an exclusive

**STATES' COMPLAINT, Dec. 22, 1998**

agreement with FIS would provide no assurances of supply, given that Mylan could not use any FIS

lorazepam API for at least a year, due to FDA regulations.

## X.

## FIRST CLAIM FOR RELIEF -- CONSPIRACY TO

## MONOPOLIZE GENERIC LORAZEPAM TABLETS MARKET

43.     The States reallege and incorporate by reference paragraphs 1 through 42.

44.     Mylan, Cambrex, Profarmaco, and Gyma conspired to act together to obtain

monopoly power for Mylan in the generic lorazepam tablets market in the United States in violation

of Section 2 of the Sherman Act, 15 U.S.C. § 2.

45.     Mylan acted with a specific intent to monopolize, and to destroy competition in, the

generic lorazepam tablets market.  Mylan devised and implemented a calculated campaign to raise

the price and profitability of lorazepam by locking up the supply of lorazepam API, the most essential

ingredient for making lorazepam tablets.  Each of the co-conspirators acted with the specific intent

that Mylan obtain monopoly power in the generic lorazepam tablets market, and through their profit

sharing arrangement and the resulting higher prices, the co-conspirators each have profited

significantly from their conspiracy to the detriment of consumers.

46.     In furtherance of this conspiracy, these Defendants entered into an agreement and

profit sharing arrangement whereby Mylan obtained the exclusive license to Profarmaco's lorazepam

API.  This license had the purpose and effect of denying, to Mylan's competitors in the generic

lorazepam tablets market, the supply of an essential raw material.  Also in furtherance of this

conspiracy, Mylan -- with the full knowledge and approval of Cambrex, Profarmaco, and Gyma --

**STATES' COMPLAINT, Dec. 22, 1998**

sought to obtain the exclusive right to the only other active supplier of lorazepam API to generic manufacturers.

XI.

SECOND CLAIM FOR RELIEF -- CONSPIRACY TO

MONOPOLIZE GENERIC CLORAZEPATE TABLETS MARKET

47.     The States reallege and incorporate by reference paragraphs 1 through 42.

48.     Mylan, Cambrex, Profarmaco, and Gyma conspired to act together to obtain monopoly power for Mylan in the generic clorazepate tablets market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

49.     Mylan acted with a specific intent to monopolize, and to destroy competition in, the generic clorazepate tablets market.  Mylan devised and implemented a calculated campaign to raise the price and profitability of clorazepate by locking up the supply of clorazepate API, the most essential ingredient for making clorazepate tablets.  Each of the co-conspirators acted with the specific intent that Mylan obtain monopoly power in the generic clorazepate tablets market, and through their profit sharing arrangement and the resulting higher prices, the co-conspirators each have profited significantly from their conspiracy to the detriment of consumers.

50.     In furtherance of this conspiracy, these Defendants entered into an agreement and profit sharing arrangement whereby Mylan obtained the exclusive license to Profarmaco's clorazepate API.  This license had the purpose and effect of denying, to Mylan's competitors in the generic clorazepate tablets market, the supply of an essential raw material.

**STATES' COMPLAINT, Dec. 22, 1998**

17

XII.

THIRD CLAIM FOR RELIEF

AGREEMENT IN RESTRAINT OF TRADE ON LORAZEPAN

51.     The States reallege and incorporate by reference paragraphs 1 through 42.

52.     Mylan's exclusive licensing agreement with Cambrex, Profarmaco, and Gyma, pursuant to which Mylan obtained the exclusive right to Profarmaco's supply of lorazepam API, unreasonably restricts competition and constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

53.     Under this licensing agreement, Mylan licensed, on a ten year exclusive basis, Profarmaco's lorazepam API.  The purpose or effect of this agreement is to foreclose substantially the supply of lorazepam API to Mylan's competitors, thereby restraining trade and competition in the generic lorazepam tablets market and enabling Mylan to raise prices significantly.

54.     This agreement is not reasonably necessary to accomplish any procompetitive objective.  Moreover, any justification that may exist does not outweigh the substantial anticompetitive effect of Defendants' conduct.

XIII.

FOURTH CLAIM FOR RELIEF

AGREEMENT IN RESTRAINT OF TRADE ON CLORAZEPATE

55.     The States reallege and incorporate by reference paragraphs 1 through 42.

56.     Mylan's exclusive licensing agreement with Cambrex, Profarmaco, and Gyma, pursuant to which Mylan obtained the exclusive right to Profarmaco's supply of clorazepate API,

**STATES' COMPLAINT, Dec. 22, 1998**

unreasonably restricts competition and constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

57.    Under this licensing agreement, Mylan licensed, on a ten year exclusive basis, Profarmaco's clorazepate API.  The purpose or effect of this agreement is to foreclose substantially the supply of clorazepate API to Mylan's competitors, thereby restraining trade and competition in the generic clorazepate tablets market and enabling Mylan to raise prices significantly.

58.    This agreement is not reasonably necessary to accomplish any procompetitive objective.    Moreover, any justification that may exist does not outweigh the substantial anticompetitive effect of Defendants' conduct.

XIV.

FIFTH CLAIM FOR RELIEF

MONOPOLIZATION OF GENERIC LORAZEPAM TABLETS MARKET

59.    The States reallege and incorporate by reference paragraphs 1 through 42.

60.    Mylan obtained monopoly power in the generic lorazepam tablets market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Using this monopoly power, Mylan raised the price of generic lorazepam tablets by amounts ranging from 1,900 percent to over 2,600 percent, depending on the bottle size and strength.

61.    Mylan willfully acquired its monopoly power by entering into an exclusive licensing agreement for Profarmaco's lorazepam API.  This exclusive license provided Mylan complete control over Profarmaco's supply of lorazepam API in the United States market, which enabled Mylan to

**STATES' COMPLAINT, Dec. 22, 1998**

deny its actual or potential competitors access to this essential ingredient for producing generic lorazepam tablets and significantly raise prices.

XV.

SIXTH CLAIM FOR RELIEF -- ATTEMPTED

MONOPOLIZATION OF GENERIC LORAZEPAM TABLETS MARKET

62.   The States reallege and incorporate by reference paragraphs 1 through 42.

63.   Mylan acted with a specific intent to monopolize, and to destroy competition in, the generic lorazepam tablets market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Mylan devised and implemented a calculated campaign to raise the price and profitability of lorazepam by locking up the supply of lorazepam API, the most essential ingredient for making generic lorazepam tablets.

64.   Mylan has willfully engaged in a course of exclusionary conduct in order to obtain a monopoly in the generic lorazepam tablets market, including, *inter alia*: (1) entering into an exclusive licensing agreement for Profarmaco's lorazepam API; and (2) approaching SST -- the only other active distributor of lorazepam API to generic manufacturers in the United States -- proposing a similar licensing arrangement for FIS's lorazepam API, even though Mylan could not even use any of FIS's lorazepam API because of FDA regulations.

65.   At the time Mylan engaged in these acts, it had a dangerous probability of succeeding in controlling the supply of lorazepam API and excluding its competitors. Mylan, by obtaining the exclusive licensing agreement with Cambrex, Profarmaco, and Gyma, prevented certain competitors from obtaining lorazepam API, enabling Mylan to significantly raise prices. Had SST agreed to

**STATES' COMPLAINT, Dec. 22, 1998**

Mylan's proposal, it would have denied lorazepam API to other competitors and potential competitors, allowing Mylan to acquire or maintain monopoly power in the generic lorazepam tablets market.

## XVI.

### SEVENTH CLAIM FOR RELIEF

### MONOPOLIZATION OF GENERIC CLORAZEPATE TABLETS MARKET

66.     The States reallege and incorporate by reference paragraphs 1 through 42.

67.     Mylan possessed monopoly power in the generic clorazepate tablets market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Using this monopoly power, Mylan raised the price of generic lorazepam tablets by amounts ranging from 1,900 percent to over 3,200 percent, depending on the bottle size and strength.

68.     Mylan willfully acquired its monopoly power by entering into an exclusive licensing agreement for Profarmaco's clorazepate API. This exclusive license provided Mylan with complete control over Profarmaco's supply of clorazepate API in the United States market, which enabled Mylan to deny its actual or potential competitors access to this essential ingredient for producing generic clorazepate tablets and significantly raise prices.

## XVII.

### EIGHTH CLAIM FOR RELIEF

### ATTEMPTED MONOPOLIZATION OF GENERIC CLORAZEPATE TABLETS MARKET

69.     The States reallege and incorporate by reference paragraphs 1 through 42.

**STATES' COMPLAINT, Dec. 22, 1998**

70.     Mylan acted with a specific intent to monopolize, and to destroy competition in, the generic clorazepate tablets market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Mylan devised and implemented a calculated campaign to raise the price and profitability of clorazepate by locking up the supply of clorazepate API, the most essential ingredient for making clorazepate tablets.

71.     Mylan has willfully engaged in a course of exclusionary conduct in order to obtain a monopoly in the generic lorazepam tablets market, including, *inter alia*, entering into an exclusive licensing agreement for Profarmaco's clorazepate API.

72.     At the time Mylan engaged in these acts, it had a dangerous probability of succeeding in controlling the supply of clorazepate API and excluding its competitors.  Mylan, by obtaining the exclusive licensing agreement with Cambrex, Profarmaco and Gyma, prevented certain competitors from obtaining clorazepate API, enabling Mylan to significantly raise prices.

XVIII.

NINTH CLAIM FOR RELIEF

PRICE FIXING AGREEMENT ON LORAZEPAM API

73.     The States reallege and incorporate by reference paragraphs 1 through 42.

74.     Mylan, Cambrex, Profarmaco, Gyma, and SST conspired to fix, raise, or stabilize the prices of lorazepam API, a *per se* violation of  Section 1 of the Sherman Act, 15 U.S.C. § 1.

75.     In furtherance of this conspiracy, Mylan met with SST in Pittsburgh, Pennsylvania on or around November 20, 1997.  At this meeting, or otherwise in the course of their exchanges of information before and after it, Mylan and SST conspired and reached an agreement to fix, raise, or

**STATES' COMPLAINT, Dec. 22, 1998**

stabilize the price of lorazepam API.  Among other things, SST agreed to raise the price of lorazepam API to its customers.

76.    In accordance with this agreement, Mylan substantially raised the price of its lorazepam tablets, and by virtue of its profit sharing arrangement with Cambrex, Profarmaco, and Gyma, substantially raised the effective price of Profarmaco's lorazepam API.  Also in accordance with this agreement, SST substantially raised the price of its lorazepam API.  By raising the price of, and limiting the supply of, its lorazepam API, SST ensured that its customers would follow Mylan's pricing for generic lorazepam tablets.

XIX.

SUPPLEMENTAL STATE LAW CLAIMS

77.    Plaintiff State of Connecticut repeats and realleges each and every allegation contained in paragraphs 1 through 76 with the same force and effect as if here set forth in full.

78.    The aforementioned practices of Defendants were in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. Sections 35-24 *et seq*.  The State of Connecticut is entitled to redress pursuant to §§ 35-32, 35-34, 35-35 and 35-38 of the Connecticut General Statutes.

79.    Plaintiff State of Florida repeats and realleges each and every allegation contained in paragraphs 1 through 76 with the same force and effect as if set forth in full herein.

80.    The  aforementioned practices by Defendants were in violation of Chapter 542, Florida Statutes (the Florida Antitrust Act of 1980), and Chapter 501, Part II, Florida Statutes (the Florida Deceptive and Unfair Trade Practices Act).

**STATES' COMPLAINT, Dec. 22, 1998**

81.     Plaintiff State of Illinois repeats and realleges each and every allegation contained in paragraphs 1 through 76 with the same force and effect as if set forth in full herein.

82.     The aforementioned practices by the Defendants were in violation of the Illinois Antitrust Act, 740 ILCS 10/3.

83.     Plaintiff State of Minnesota repeats and realleges each and every allegation contained in paragraphs 1 through 76 with the same force and effect as if set forth in full herein.

84.     The aforementioned practices by Defendants were in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-325D.66.

85.     Pursuant to Minn. Stat. § 325D.57 and acting under the Attorney General's authority to bring actions as *parens patriae*, the State of Minnesota brings this action to recover three times the damages suffered by Minnesota consumers as a result of Defendants' illegal, anticompetitive conduct.

86.     The State of Minnesota also brings this action pursuant to Minn. Stat. § 325D.57 and 325D.59, to recover three times the damages suffered by Minnesota governmental entities as a result of Defendants' illegal, anticompetitive conduct.   The State of Minnesota also seeks statutory penalties, costs, disbursements and attorneys fees from Defendants, as well as all available injunctive relief pursuant to Minn. Stat. §8.31 and Minn. Stat. § 325D.59.

87.     Plaintiff State of New York repeats and realleges each and every allegation contained in paragraphs 1 through 76 with the same force and effect as if here set forth in full.

88.     Defendants' practices violate New York General Business Law §§ 340-347.

**STATES' COMPLAINT, Dec. 22, 1998**

89.     Plaintiff State of North Carolina repeats and realleges each and every allegation contained in paragraphs 1 through 76 with the same force and effect as if here set forth in full.

90.     The aforementioned practices by Defendants were in violation of N.C. Gen. Stat. §§ 75-1 *et seq.*, and were in knowing violation of law.

91.     Plaintiff State of Ohio repeats and realleges each and every allegation contained in paragraphs 1 through 76 with the same force and effect as if set forth in full herein.

92.     The aforementioned practices by Defendants were in violation of Ohio's antitrust law, the Ohio Valentine Act, Ohio Rev. Code §§ 1331.01 *et seq.* and Ohio Rev. Code § 109.81.

93.     Pursuant to Ohio Rev. Code §§ 109.81, 1331.03, 1331.08 and 1331.11, the State of Ohio brings this action for two times the amount of damages sustained by the State and its natural person citizens, together with costs and attorney fees, civil penalties, and all other available equitable relief, including injunctive relief and restitution and disgorgement.

94.     Plaintiff, State of West Virginia, repeats and realleges each and every allegation contained in paragraphs 1 through 76 with the same force and effect as if set forth in full herein.

95.     The aforementioned practices by Defendants were in violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*, and in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-1-101 *et seq.*

96.     Plaintiff, State of Wisconsin, repeats and realleges each and every allegation contained in paragraphs 1 through 76 with the same force and effect as if set forth in full herein.

97.     The aforementioned practices by Defendants were in violation of the Wisconsin Trusts and Monopolies Act, Wis. Stats. § 133.03.

**STATES' COMPLAINT, Dec. 22, 1998**

## XX.

## EFFECTS

98.     The acts and practices of the Defendants as herein alleged have had the purpose or effect, or the tendency or capacity, to restrain competition unreasonably and to injure competition in the following ways, among others:

99.     Restraining competition in the markets for lorazepam and clorazepate APIs and tablets;

100.    Fixing, raising, stabilizing, or otherwise tampering with the prices of lorazepam API;

101.    Raising the cost that pharmacies, hospitals, insurers, managed care organizations, wholesalers, government agencies, consumers, and others pay for lorazepam and clorazepate tablets;

102.    Depriving consumers of access to needed pharmaceuticals and thereby injuring their health; and

103.    Depriving consumers of the benefits of competition among generic pharmaceutical manufacturers and entry from new competitors.

## XXI.

## INJURY

104.    As a direct and proximate result of the unlawful conduct alleged above, the States were not able to purchase lorazepam and clorazepate at prices determined by free and open competition, and consequently have been injured in their business and property in that, *inter alia*, they have paid more for lorazepam and clorazepate than they would have paid in a free and open competitive market.  The States cannot quantify at this time the precise amount of damages which

**STATES' COMPLAINT, Dec. 22, 1998**

they have sustained, but allege that such damages are substantial.  A precise determination of total damages will require discovery from the books and records of the Defendants and third parties.

105.   As a direct and proximate result of the unlawful conduct alleged above, consumers in the Plaintiff States were not able to purchase lorazepam and clorazepate at prices determined by free and open competition, and consequently have been injured in that, *inter alia*, they have paid more for lorazepam and clorazepate than they would have paid in a free and open competitive market.  The States cannot quantify at this time the precise amount of damages which their consumers have sustained, but allege that such damages are substantial.  A precise determination of total damages will require discovery from the books and records of the Defendants and third parties.

106.   As a direct and proximate result of the unlawful conduct alleged above, the general economies of the States have sustained injury, and are threatened with further injury to their business and property unless the Defendants are enjoined from their unlawful conduct.

107.   Defendants' unlawful conduct is continuing and will continue unless the injunctive and equitable relief request is granted.  The States do not have an adequate remedy at law.

## XXII.

### JURY TRIAL DEMAND

108.   The States demand trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by jury.

**STATES' COMPLAINT, Dec. 22, 1998**

## XXIII.

## PRAYER FOR RELIEF

WHEREFORE, the States pray that the Court:

1.      Adjudge and decree that Defendants have engaged in conduct in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

2.      Adjudge and decree that Defendants have engaged in conduct in violation of the state statutes enumerated in Paragraphs 77 through 97;

3.      Enjoin and restrain, pursuant to state and federal law, the Defendants, their affiliates, assignees, subsidiaries, successors and transferees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing, maintaining or renewing the contracts, combinations or conspiracies alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

4.      Declare void and unenforceable the exclusive agreements entered into by Defendants Mylan, Cambrex, Profarmaco and Gyma dated November 14, 1997;

5.      Award the States all other available equitable relief, including restitution and disgorgement, as the Court finds necessary to redress Defendants' violations of state law;

6.      Award each State the costs of this action, including reasonable attorneys' fees;

**STATES' COMPLAINT, Dec. 22, 1998**

7.      Enter judgment for the States for three times the amount of damages sustained by the States and the persons they represent as allowed by federal law, together with the costs of this action, including reasonable attorneys' fees;

8.      Enter judgment for the States of Connecticut, Florida, Illinois, Minnesota, New York, North Carolina, West Virginia and Wisconsin for three times the amount of damages sustained by the States as allowed by state law, together with the costs of this action, including reasonable attorneys' fees;

9.      Enter judgment for the States of Connecticut, Florida, Illinois, Minnesota, New York, West Virginia and Wisconsin for three times the amount of damages sustained by the persons they represent as allowed by state law, together with the costs of this action, including reasonable attorneys' fees;

10.     Enter judgment for the State of Ohio for two times the amount of damages sustained by the State and the persons it represents as allowed by state law, as appropriate, together with the costs of this action, including reasonable attorneys' fees;

11.     Enter judgment for the State of Florida for the amount of damages sustained by the consumers it represents as allowed by state law, as appropriate, together with the costs of this action, including reasonable attorneys' fees;

12.     Enter judgment for the States of Connecticut, Florida, Illinois, Minnesota, New York, North Carolina, Ohio, West Virginia and Wisconsin against the Defendants for the maximum civil penalties determined by the Court to be just and proper, based, depending on the laws of each State, on:  (1) each transaction or act in violation of the law; (2) each unlawful agreement between or

**STATES' COMPLAINT, Dec. 22, 1998**

among any of the Defendants; or (3) the overarching, continuing agreement in restraint of trade between or among any of the Defendants;

13.     Enter judgment pursuant to Wis. Stats. § 133.14 for the State of Wisconsin and its consumers (1) declaring void any and all contracts or agreements founded upon, the result of, growing out of, or connected with, the violations of the Wisconsin Trusts and Monopolies Act, Wis. Stat. § 133.03, either directly or indirectly; and, (2) for all payments made by the State of Wisconsin and its consumers which relate, directly or indirectly, to such contracts or agreements;

14.     Enter judgment for the State of North Carolina and its consumers (1) declaring void any and all contracts or agreements founded upon, the result of, growing out of or connected with the violations of N.C. Gen. Stat. §§ 75-1 *et seq.*, either directly or indirectly; and, (2) for all payments made by the State of North Carolina and its consumers which relate, directly or indirectly, to such contracts or agreements; and,

15.     Grant such other and further relief, including all other available equitable relief, as the case may require and the Court may deem just and proper to redress Defendants' violations of state and federal law.

**STATES' COMPLAINT, Dec. 22, 1998**

Respectfully submitted this **22ⁿᵈ** day of _December_ 1998.

HUBERT H. HUMPHREY III
Attorney General
State of Minnesota

BY: _Ann Beimdiek Kinsella_
Ann Beimdiek Kinsella
Minn. Atty. #256201

_Peter B. Hofrenning_
Peter B. Hofrenning
Minn. Atty. #247303
Assistant Attorneys General
Antitrust Division
Minnesota Attorney General's Office
N.C.L. Tower, Suite 1400
445 Minnesota Street
St. Paul, MN 55101
(651)296-7575

Counsel for Minnesota
and on behalf of the Plaintiff States
(listed below)

**Plaintiff States:**

**STATE of CONNECTICUT**
RICHARD BLUMENTHAL
Attorney General
Steven M. Rutstein
Department Head
Antitrust and Consumer Protection Department
Arnold B. Feigin
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
(860)808-5400

**STATE of FLORIDA**
ROBERT A. BUTTERWORTH
Attorney General
Patricia A. Conners
Chief, Antitrust Section
Kimberly L. King
Peter H. Williams
Assistant Attorneys General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850)414-3600

**STATE of ILLINOIS**
JAMES E. RYAN
Attorney General
Christine H. Rosso
Chief, Antitrust Bureau
Don R. Sampen
Assistant Attorney General
100 West Randolph Street
Chicago, IL 60601
(312)814-5610

**STATES' COMPLAINT, Dec. 22, 1998**

**STATE of MINNESOTA**
HUBERT H. HUMPHREY III
Attorney General
Thomas F. Pursell
Senior Counsel
Ann Beimdiek Kinsella
Peter B. Hofrenning
Assistant Attorneys General
Antitrust Division
N.C.L. Tower, Suite 1400
445 Minnesota Street
St. Paul, MN 55101
(651)296-7575

**STATE of NEW YORK**
DENNIS C. VACCO
Attorney General
Stephen D. Houck
Chief, Antitrust Bureau
Robert L. Hubbard
Susan E. Raitt
Assistant Attorneys General
120 Broadway, Suite 26-01
New York, NY 10271
(212)416-6163

**STATE of NORTH CAROLINA**
MICHAEL F. EASLEY
Attorney General
K.D. Sturgis
Assistant Attorney General
Consumer Protection/Antitrust Section
114 W. Edenton Street
P.O. Box 629
Raleigh, NC 27602-0629
(919)716-6000

**STATES' COMPLAINT, Dec. 22, 1998**

**STATE of OHIO**
BETTY D. MONTGOMERY
Attorney General
Doreen Johnson
Chief, Antitrust Section
Raj Malik
Assistant Attorney General
Mitchell L. Gentile
Senior Attorney
140 East Town Street, 1st Floor
Columbus, Ohio 43215
(614)466-4328

**COMMONWEALTH of PENNSYLVANIA**
D. MICHAEL FISHER
Attorney General
James A. Donahue III
Chief Deputy Attorney General
Antitrust Section
Deneice Covert Zeve
Deputy Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120
(717)787-4530

**STATE of WEST VIRGINIA,**
DARREL V. McGRAW, JR.
Attorney General
Jill L. Miles
Deputy Attorney General
Douglas L. Davis
Assistant Attorney General
Consumer Protection and Antitrust Division
P.O. Box 1789
Charleston, WV 25326-1789
(304)558-8986

**STATES' COMPLAINT, Dec. 22, 1998**

STATE of WISCONSIN
JAMES E. DOYLE
Attorney General
Kevin J. O'Connor
Assistant Attorney General
123 West Washington Avenue
P.O. Box 7857
Madison, WI 53703-7857
(608)266-8986

AG:169444 v1

STATES' COMPLAINT, Dec. 22, 1998